U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 10, 2008

**BY HAND**

The Honorable Denny Chin
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Justin P. White**,
            **07 Cr. 848 (DC)**

Dear Judge Chin:

      The Government respectfully submits the following in response to the defendant's submission dated August 27, 2008, and in anticipation of the defendant's sentencing, which is presently scheduled for Monday, September 15, 2008. The defendant — who purchased child pornography and possessed nearly a thousand images and videos, many of which depicted intercourse with pre-pubescent children — seeks a non-custodial sentence. For the reasons that follow, the Government opposes the defendant's request and seeks a sentence within the Guidelines range of 78 to 97 months' imprisonment.

**Factual Background**

      As described in more detail in the PSR, when interviewed by agents from Immigration and Customs Enforcement ("ICE") on or about June 7, 2007, the defendant admitted to downloading child pornography. PSR ¶ 23. Based on those statements and other corroborating evidence, the Government sought and obtained a search warrant for the defendant's two computers. (The defendant was asked for, but declined to give, consent to agents to view the computers during the initial interview.) A forensic analysis of those computers revealed a total of 984 still images and 125 videos of child pornography, and the overwhelming majority were of pre-pubescent children less than age 12. Dozens of the images show sexual penetration of a minor child that, based on the age of the child and the nature of the sexual act, would have to have been painful to the child. The National Center for Missing and Exploited Children has analyzed the images and identified 185 image files from 27 known series of child pornography. PSR ¶ 24.

Hon. Denny Chin
September 10, 2008
Page 2 of 10

      The defendant obtained those images in part through a membership in a web site that catered to child pornography. When visited by ICE agents in or about October 2005, the web site, named "Illegal CP,"[1] advertised "tons of uncensored forbidden pics," called itself the "best site on the net," featured, on the entrance page to the web site, more than a dozen images of minors engaged in sexual conduct, and warned prospective members that the site was "considered to be illegal in all countries," but advised that, if questioned by police, members of the web site could simply say that someone had stolen their credit card to gain access to the site. PSR ¶¶ 11, 13.

      Bank records show that the defendant subscribed to "Illegal CP" on at least two occasions, in April and June 2006, at a cost of $79.99 per instance. PSR ¶¶ 20, 25. From examining the forensic report prepared by ICE, it appears the defendant's collection behavior was concentrated most recently in the two months he purchased those memberships. There are other periods of concentration — meaning a single day or short period of time when many of the images were downloaded — in January 2004, Fall 2005, and January-February 2006. It would be inaccurate to suggest that the defendant's child pornography collection was downloaded on only two or three occasions. Leaving aside deleted images, the defendant downloaded child pornography on 35 different days between January 10, 2004 and July 31, 2006, as shown in the attached list. Nor would it be accurate to suggest the defendant desisted entirely from viewing the images long before law enforcement interviewed him: Although the vast majority of images had not been accessed for months prior to the search warrant, a few of those files were accessed as recently as May 2007.[2] PSR ¶ 25.

      As described in graphic detail in the PSR, the defendant possessed dozens of images and videos of the sexual exploitation of pre-pubescent children (as opposed to adolescent minors), including penetrative sexual activity that, based on the age of the child and the nature of the sexual act, would have to have been painful to the child. (PSR ¶ 30). Those images included the following videos, to name just a few:

- a child is restrained with ropes while her nipples are pinched, causing her to flinch (227713);

---

[1] "CP" is a common abbreviation for "child pornography."

[2] The forensic analysis also reveals that the defendant deliberately altered the default settings on the file-sharing software (LimeWire) to remove the folders containing child pornography from the folders of materials LimeWire made available to others over the Internet.
The forensic report was made available to defense counsel in discovery and is available for the Court to review, should the Court wish to see detailed information about the time and date each image was "created" (downloaded) and last accessed.

- a child is restrained while, among other things, hot wax is poured on her, causing her to cry out (53766);

- a child is "hog tied" and crying while she is vaginally penetrated (227837); and

- an adult male ejaculates into a toddler's mouth as she cries "no" and spits up (227818).

On or about February 29, 2008, the defendant pleaded guilty pursuant to a plea agreement with this Office. At the time, the defendant disputed whether the a four-level increase, pursuant to U.S.S.G. § 2G2.2(b)(4), was warranted, and, accordingly, the parties agreed that the Stipulated Guidelines Range (in light of that dispute) was anywhere from 51 to 97 months' imprisonment, and that "a sentence within the Stipulated Guidelines range would constitute a reasonable sentence." (Plea Agreement at 3). The defendant now agrees with the Probation Department and the Government that the 4-level enhancement (for the possession of sado-masochistic material) is appropriate, and that the Guidelines range is 78 to 97 months' imprisonment. (Def.'s Sub. at 2).

## Legal Principles

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594.; *see also Rita v. United States*, 127 S. Ct. at 2464. After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). *Gall v. United States*, 128 S. Ct. at 596-97.

Hon. Denny Chin
September 10, 2008
Page 4 of 10

## Discussion

**A. The Guidelines Range Reflects the Seriousness of the Offense and the Need for Both General and Specific Deterrence**

By paying for access to child pornography, which he downloaded, saved, and then viewed repeatedly, later viewing the images he downloaded, the defendant perpetuated the victimization of the children in those images. Child pornography is a permanent record of the sexual abuse of a child victim, and each time an Internet user downloads child pornography, he perpetuates the victimization of the minor appearing in the pornography. Indeed, Congress made a specific finding, in connection with the recent passage of the Adam Walsh Child Protection and Safety Act of 2006, P.L. 109-248, 120 Stat. 587 (2006), that "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Id. at § 501(2)(D). As described in the PSR, this is precisely how one of the victims who was depicted in images possessed by the defendant feels every time someone, like the defendant, views images of the sexual abuse she endured as a child. See PSR ¶ 31.

The defendant's sentence must reflect the harm that trafficking in these images inflicts upon the victims and the parents of the victims who are depicted in these images. In a child pornography case like this, the primary victims are the children depicted. *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001); *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001). As the *Sherman* Court noted, "child pornography directly victimizes the children portrayed by violating their right to privacy." *Id.* And as the Court noted in *Shutic*, "children . . . suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse a secret . . . . concern for the welfare of the children who are used to create pornography is part of the public concern over child pornography." *Shutic*, 274 F.3d at 1126. (citations omitted); *see also United States v. Norris*, 159 F.3d 159 F.3d 926, 929-30 (5th Cir. 1998) (a consumer of sexual images causes children of pornographic abuse to suffer in various ways: (1) the abuse is perpetuated through dissemination, (2) the existence of the image is an invasion of the child's privacy, and (3) the demand for the creation of more images is created by the consumer). Courts have recognized that even a "'passive' consumer who merely receives or possesses the images directly contributes to this continuing victimization." *Sherman*, 268 F.2d at 545 (citations omitted). "Indeed, one of the reasons for criminalizing the 'mere' possession of child pornography is to create an incentive for the possessor to destroy the material, and alleviate some of these harms to the children depicted." *Sherman*, 268 F.3d at 547.

The defendant argues that two enhancements that apply under the Guidelines — one for the sado-masochistic nature of the images, and one for the quantity of images — should be given less weight, because the defendant "mindlessly downloaded all images" available on the site he was visiting at the time. (Def.'s Sub. at 7). This argument obscures the facts. As the defendant himself describes his activity, he first sought out child pornography in or about 2001,

after he learned that his father molested his cousin, and he heard on the radio that certain "images of nude girls in non-sexual poses were legal and considered art." Def.'s Sub. Ex. B at 6. He began searching for such "art" out of curiosity, but before long, he was viewing web sites with "shocking" and "horrif[ying]" images of prepubescent girls having sex. At that very moment, the defendant knew that the images he was pursuing included images of activity that, based on the age of the child and the nature of the sexual activity, would have to have been painful to the child — which is the standard for applying the 4-level enhancement under the Guidelines. *See United States v. Demarle*, 99 F.3d 80, 83 (2d Cir. 1996). Notwithstanding that shock and horror, the defendant proceeded to download "a handful" of images, which he deleted when his then-girlfriend found them and confronted him. In or about 2004, he downloaded additional images again because "it made [his] time a little more interesting." *Id.* at 7. He downloaded again after that point, *id.* at 8, and again around Christmas 2005, *id.* at 8, and again in 2006, when he purchased a second membership in a web site, *id.* at 9. The forensic report from ICE reveals that the defendant downloaded child pornography on at least 35 separate occasions in 2004 to 2006 alone (leaving aside his activity in 2001). He returned to many of those images after he downloaded them, and he deleted only about half of the still images that he downloaded prior to the execution of the search warrant. In sum, the defendant knew full well (and early on) both the nature of the images he was downloading, and the quantity of those images, and the Guidelines properly hold him accountable for both.

In addition, the Guidelines justifiably provide for an enhancement where the defendant uses a computer in connection with the offense because computers present particular harms with respect to child pornography: "Distributing child pornography through computers is particularly harmful because it can reach an almost limitless audience. Because of its wide dissemination and instantaneous transmission, computer-assisted trafficking is also more difficult for law enforcement officials to investigate and prosecute." H.R. Rep. No. 104-90, at 3-4 (1995), reprinted in 1995 U.S.C.C.A.N. 759, 760-61.

Further, the Guidelines can be considered conservative in one sense, because they do not explicitly take into account an aggravating factor: the defendant, on at least two occasions, paid for access to a web site that was exclusively devoted to child pornography. In so doing, the defendant financially supported the worldwide market for child pornography. It is that market (and in large part the desire for financial gain) that encourages the physical abuse of children around the world (often in countries where law enforcement is less robust) so that abuse can be memorialized for the entertainment of others, including the defendant. As Congress recognized in passing the PROTECT Act in 2003: "The Government . . . has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective. The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." PROTECT Act, PL 108-21, 117 Stat. 650, Section 501 (April 30, 2003) (quoting *New York v. Ferber*, 458 U.S. 747, 760 (1982)). By

purchasing at least some of the pornography he possessed, the defendant himself helped promote the production of child pornography by funding it.

**B. The Court Should Give Deference to the Child Pornography Guidelines**

The Guidelines range appropriately reflects the seriousness of the defendant's crime, and nothing in defense counsel's submission suggests that this defendant should be treated differently from any other defendant in a "mine-run" child pornography case. Instead, the defendant's submission seems to argue principally that the Guidelines range for child pornography is too long as a matter of public policy. For the following reasons, however, the Guidelines range deserves deference by the Court and provides a sentence that is sufficient (but not greater than necessary) in this case, and would avoid unwarranted sentencing disparities.

The defendant argues that the Court should give little heed to the child pornography Guidelines for policy reasons similar to those articulated in *Kimbrough v. United States*, 128 S. Ct. 558 (2007) and *Gall v. United States*, 128 S. Ct. 586 (2007). *Kimbrough*, however, is inapplicable to this case and offers no support for the defendant's argument. In *Kimbrough*, the Supreme Court was faced with a district court's decision to vary from application of the 100:1 crack/cocaine ratio that existed in the then-applicable version of the Guidelines. The Court explained that in the current advisory Guidelines regime, a sentencing court's decision to vary from the Guidelines "attract[s] greatest respect" when the judge finds that the facts of the case falls "'outside the heartland to which the Commission intends individual Guidelines to apply.'" *Kimbrough*, 128 S. Ct. at 575 (quoting *United States v. Rita*, 127 S. Ct. 2456, 2465 (2007) (internal quotation omitted)). Conversely, the Court stated that "closer review may be in order" when the judge varies from the Guidelines range in "mine-run case[s]" based solely on a policy disagreement with the Guidelines. *Id.* Given the tortured history of the 100:1 crack/cocaine ratio in the Guidelines, however, which included the Commission's disassociation from it, and the Commission's repeated efforts to change it, the Court determined that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/[cocaine] disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.*

The defendant appears to rely on the Supreme Court's conclusion that the crack/cocaine ratio "did not take account of 'empirical data and national experience.'" *Kimbrough*, 128 S. Ct. at 575 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, *J.*, concurring)). Based on this language, he argues that § 2G2.2, which he deems equally unmoored from independent research and analysis, is entitled to no deference. His argument is unpersuasive. The Guideline at issue here bears no resemblance to the crack/cocaine Guidelines discussed in *Kimbrough*. Whereas the Supreme Court pointed out the Sentencing Commission's long history of dissatisfaction with the 100:1 crack/cocaine ratio in the Guidelines, *Kimbrough*, 128 S. Ct. at 566-69, the defendant has pointed to nothing showing

Hon. Denny Chin
September 10, 2008
Page 7 of 10

similar dissatisfaction with § 2G2.2. He has pointed to no findings by the Sentencing Commission that the child pornography Guidelines are overstated, or any attempts by the Commission to convince Congress to reduce or change the child pornography Guidelines. In contrast, the Supreme Court noted in *Kimbrough* that the Sentencing Commission specifically concluded that the 100:1 crack/cocaine ratio significantly overstated the differences between the two forms of the drug, and that the Commission had made repeated attempts over the course of several years to urge Congress to repeal or reduce the 100:1 crack/cocaine ratio. *Kimbrough*, 128 S. Ct. at 568-69.[3]

The respective base offense level under § 2G2.2 is now higher than in the original edition of the Guidelines, but the Commission has explained that such increases are consistent with the increased penalties for child pornography offenses that have resulted from the passage of statute. U.S.S.G., app. C, amend. 664 at 58. The defendant decries these changes as motivated only by "a general revulsion that is associated with child-exploitation." Def.'s Sub. at 6. Nevertheless, it is undisputed that Congress has the power to increase penalties for criminal offenses and that the Sentencing Commission is authorized to increase the Guidelines to reflect these amended statutory ranges. *See* 28 U.S.C. § 994(b)(1) (directing Commission to "establish a sentencing range that is consistent with all pertinent provisions of title 18, United States Code"); § 994(o) (directing Commission to review and revise the Guidelines based on new information). *See generally Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) ("[T]he Commission is fully accountable to Congress."); *United States v. Huerta*, 878 F.2d 89, 93 (2d Cir. 2006).

Such increases in the statutory range for child pornography offenses are consistent with Congress's attempt to "restore the government's ability to prosecute child pornography offenses successfully," *United States v. MacEwan*, 445 F.3d 237, 249 n.12 (3d Cir. 2006) (quoting S. Rep. No. 108-2, at 1 (2003)), by "ensuring that the criminal prohibitions against child pornography remain enforceable and effective," PROTECT Act, Pub. L. No. 108-21, § 501, 117 Stat. 650, 676 (2003), codified at 18 U.S.C. § 2251 note. As the Supreme Court recently explained, "Child pornography harms and debases the most defenseless of our citizens. Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 128 S. Ct. 1830, 1846 (2008). Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Guidelines were first promulgated. *See* S. Rep. No. 108-2.

---

[3] Criticisms of the Feeney Amendment that focus on the availability of downward departures under the Guidelines seem irrelevant to this case, where the defendant seeks a non-Guidelines sentence in light of the factors in 18 U.S.C. § 3553(a), not any specific downward departure *within* the Guidelines.

Indeed, despite the "pernicious evil" of the crime, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see* H. Rep. No. 108-66; S. Rep. No. 104-358, especially in light of the "continuing harm" caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers." *See* Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; *MacEwan*, 445 F.3d at 250; *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998) ("[T]he 'victimization' of the children involved does not end when the pornographer's camera is put away."). Faced with this intractable problem, it was reasonable for Congress, and the Commission, to increase the punishment for child pornography offenses. *See United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008), *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007), *see also United States v. Goff*, 501 F.3d 250, 258 n.13 (3d Cir. 2007) ("There is ample evidence of Congress's intent that offenses involving child pornography be treated severely."). Despite the defendant's arguments to the contrary, the Sentencing Commission should not be forced to adhere to the insufficient sentences provided for child pornography offenses when the Guidelines were enacted over twenty years ago.

Based on this history, the Court should not adopt the position advocated by the defendant that the child pornography Guidelines are so disproportionate that as a general matter they produce sentences that are "'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Kimbrough*, 128 S. Ct. at 575.

C.   **The History and Characteristics of the Defendant Do Not Support Either a Non-Guidelines Sentence or a Departure**

The defendant argues (both through his counsel and his letter to the Court) that a non-Guidelines sentence is warranted in part because the defendant suffered from an abusive or unfair childhood. The defendant's complaint that he had to work for spending money, "mowing the lawn and picking out weeds," while his wealthier friends "were going to their shore houses" and "wearing $150 jeans" (Def.'s Sub. Ex. B at 1-2) does not remotely rise to the level of "abuse," much less the kind of "extreme" childhood neglect that the Second Circuit has held *might* sanction a downward departure under the Guidelines. *See United States v. Rivera*, 192 F.3d 81, 86 (2d Cir. 1999) (defendant was born of a familial rape, spent time in foster homes after his stepfather was killed when the defendant was eight years old, and was physically abused by being burned, beaten with extension cords, and forced to kneel on rice in a corner).

More significantly, even where a defendant is abused as a child, such abuse does not justify a departure at sentencing unless the abuse itself "caused mental and emotional conditions that contributed to the defendant's commission of the offense." *Id.* at 85; *see also United States v. Reinoso*, 350 F.3d 51, 58 (2d Cir. 2003) ("*Rivera* explicitly limits the situations in which a departure based on abuse is warranted to those in which the abuse creates to a mental

Hon. Denny Chin
September 10, 2008
Page 9 of 10

condition that in turn leads to or causes the criminal conduct."). The defendant's submission casts about for a causal link between the defendant's childhood or family circumstances and his behavior in this case, but it offers no convincing one. Defense counsel argues that the defendant became curious about child pornography after learning that his father molested one of his cousins, and that "Justin identified with the victim, the abused children in those images." (Def.'s Sub. at 3). Defendant's mother suggests that "viewing of the images involved in this case was part of th[e] painful process" of "[p]utting an end to that relationship [with his father]." (Def.'s Sub. Ex. C at 5). Nevermind that the majority of children in the images the defendant possessed were minor (and often prepubescent) girls, while the defendant was in his mid-20s at the time he claims to have first downloaded child pornography, or that there is no clear explanation for why the defendant needed to view child pornography to address the issues between him and his father. The defendant's upbringing and life experiences in no way justify either a departure within the Guidelines or a non-Guidelines sentence.

Neither does the defendant's description of sexual activity with two cousins (when he was five, and they were seven and nine years old) (Report of Ken Lau at 3) rise to the level of abuse that in any way excuses the instant offense. For one thing, the term "abuse" seems misplaced when applied to "consensual" experimentation among three similarly aged children, which the defendant considered "normal sexual activity." (Lau Rep. at 3). While those early sexual experiences may help explain why the defendant initially viewed child pornography in 2001 (although even that link seems attenuated, given the lapse in time), they do not explain why he consistently and repeatedly downloaded and viewed images of (clearly non-consensual abuse) years later.

In fact, the defendant likely downloaded images of child pornography because those images — not images of some other kind of sexual activity, like bestiality, or homosexuality — sexually excited the defendant. Nothing more complicated than a desire for sexual gratification caused the defendant to download the images in the first place, to return to them again after that, and to decide not to delete the majority of them. No one downloads hundreds of images and videos of the graphic sexual abuse of children because of idle curiosity — or even mild depression. The images on the defendant's computers reflect his sexual tastes, expressed consistently (if episodically) over more than a year, and his unwillingness to admit as much calls into question the truth of the rest of his submission. As Mr. Lau found, "His denial will impact on his successfully completing sex offender treatment in the future." (Lau Rep. at 9).

For this reason, Dr. Bardey's conclusion that "[t]here is no evidence that Mr. White has any pedophilic proclivities" is entirely incredible. (Report of Dr. Alexander Sasha Bardey at 21 (Aug. 26, 2008)). The images themselves are evidence of the defendant's own desires and the danger he *may* pose to the community. And although Mr. Lau did find that certain empirical test scores suggested that the defendant posed a low risk of recidivism, he cautioned that those assessment scales were designed for use in cases involving "hands on

Hon. Denny Chin
September 10, 2008
Page 10 of 10

offense," and that, accordingly, those empirical scores "should be viewed with caution." (Lau Rep. at 7-8). Mr. Lau concluded: "It is difficult to accurately assess Mr. White's potential risk for future sexually aggressive behavior." (Lau Rep. at 8.) Accordingly, the Government urges that the Court imprison the defendant — not so much because of the risk he may molest children at some point in the future, which is impossible to quantify — but because of the crimes he has already committed, which crimes themselves have already injured children.

**D.      If Sentenced to a Term of Imprisonment, the Defendant Should Be Remanded**

Finally, as the Government advised defense counsel months ago, the Government respectfully submits that, if the defendant is sentenced to a term of imprisonment, he should be remanded on the day of sentence. Pursuant to Title 18, United States Code, Section 3143(b)(2), "The judicial officer *shall* order that a person who has been found guilty of an offense in a case described in [18 U.S.C. § 3142(f)(1)(A)-(C)] and sentenced to a term of imprisonment . . . be detained" (emphasis added). Section 3142(f)(1)(A) includes any "crime of violence," which is elsewhere defined by the bail statutes to include "any felony under chapter . . . 110, or 117," 18 U.S.C. § 3156(4)(C), which chapters include the offense of conviction in this case, 18 U.S.C. § 2252A(a)(5)(B). Remand is especially appropriate in this case in light of the fact that, while the defendant was released on bail and permitted to work in his mother's business, he was working on computers that contained both adult pornographic images and images of prepubescent females "dressed and posed provocatively." Memorandum from Edward Santos at 1-2 (July 28, 2008). Although the Government does not contend that the defendant necessarily downloaded those images, the fact that home confinement with electronic monitoring is, apparently, insufficient to prevent the defendant from having access to inappropriate materials counsels in favor of his incarceration from this point forward.

## Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:  *[signature]*
Adam S. Hickey
Assistant United States Attorney
Tel.: (212) 637-1039

Attachment

cc: Mitchell A. Golub, Esq. (by facsimile)

United States v. White
07 Cr. 848 (DC)

Days on which (non-deleted) CP images/videos were downloaded

01/10/04
06/08/05
06/26/05
07/03/05
08/07/05
09/12/05
09/27/05
09/28/05
10/01/05
10/04/05
10/09/05
11/02/05
11/03/05
11/06/05
11/17/05
01/13/06
02/06/06
02/23/06
04/18/06
04/22/06
04/27/06
04/28/06
04/30/06
05/07/06
05/08/06
05/13/06
05/20/06
05/22/06
07/17/06
07/18/06
07/20/06
07/22/06
07/26/06
07/30/06
07/31/06

Source: ICE Forensic Report dated August 27, 2007.